**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                   :
ANTONIO HESTER,                    :
                                   :
          **Plaintiff,**           :
     **v.**                        :
                                   :
DISTRICT OF COLUMBIA, <u>et al.</u>, :
                                   :     **Civil Action No. 04-1291 (GK)**
          **Defendants.**          :
_____   :

<u>**MEMORANDUM OPINION**</u>

Plaintiff, Antonio Hester, brings this suit alleging that Defendants, the District of Columbia and Robert C. Rice, Superintendent of the District of Columbia Public Schools, failed to provide him with a free appropriate public education ("FAPE") as required under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 14, <u>et</u> <u>seq.</u>.  This matter is before the Court on Plaintiff's Motion for Summary Judgment, [**#14**], and Defendants' Cross-Motion for Summary Judgment, [**#16**].  Upon consideration of the Motions, Oppositions, and Replies, and the entire record herein, and for the reasons stated below, Plaintiff's Motion is **granted**, and Defendants' Motion is **denied.**

**I.    BACKGROUND**

Plaintiff, Antonio Hester, is classified as "Learning Disabled with emotional concerns" and qualifies for a free appropriate public education ("FAPE") under the IDEA.  On May 10, 2000, District of Columbia Public Schools ("DCPS") developed an

Individual Education Program ("IEP") for him, which required that he receive "group therapy for forty-five minutes once a week; individual therapy thirty minutes once a week; speech therapy thirty minutes twice a week; as well as supplementary aids and transition services."  Administrative Record ("AR") at 60; Pl.'s St. of Material Facts at ¶ 2.  Hester was then sixteen years old.

On April 19, 2001, Hester pleaded guilty to two charges in Prince George's County, Maryland, and was incarcerated at the Maryland Correctional Training Center ("MCTC").  Id. at ¶ 3.  He was sentenced to a maximum of ten years, and was first eligible for parole in August 2005.[1]

On May 31, 2001, while Hester was at MCTC, a due process hearing was held on his behalf to address his claim that he had been denied FAPE.  Id. at ¶ 4.  Prior to the hearing, the parties notified the Hearing Officer that they had reached an agreement whereby DCPS agreed to provide Hester with compensatory education services for the denial of FAPE leading to the hearing, effective November 1, 2000 "until the day before he starts to receive educational benefit."[2]  AR at 64.

On June 7, 2001, a Hearing Officer Determination ("HOD") was

_____

[1]  It is unclear from the record whether Hester has been released from MCTC.

[2]  Although for some reason the parties did not provide the Court with the agreement itself, they do not dispute the relevant terms of the agreement for purposes of these Cross Motions.

issued ("2001 Consent Order and HOD").  The 2001 Consent Order and HOD found that the parties' prior agreement was appropriate, and incorporated the precise terms of their agreement into his Order. It further found that Certified Learning Center ("CLC") was an appropriate provider of Hester's educational services during his incarceration in Maryland.  Id. at 65.  The Hearing Officer ordered DCPS to implement the Special Education Services Plan outlined in his Order.

Pursuant to that plan, CLC was required to implement Hester's 2000-2001 IEP for 90 days; prior to the end of the 90-day period, CLC was to hold an IEP meeting at which appropriate evaluations would be decided upon, among other things.  DCPS was given 30 days to perform all necessary evaluations, and within 30 days of the conclusion of the evaluations, a new, appropriate IEP was to be developed for Hester.  Id.  Finally, the Hearing Officer ordered that the "form and quantity of compensatory education for the period November 2000 to the date that Antonio starts receiving educational benefit through CLC is to be determined by the IEP team."  Id. at 64.  DCPS did not appeal this Consent Order.

Following the issuance of the 2001 Consent Order and HOD, CLC representatives attempted to gain access to Hester at MCTC in order to provide him with the requisite educational services.  Pl.'s St. of Facts at ¶ 9; AR at 4.  However, MCTC refused access to CLC and instead indicated that MCTC itself would provide Hester's

educational services.  Plaintiff, his legal representative, and CLC attempted to have DCPS resolve the situation, but DCPS took the position that "there is nothing [it] can do to, [sic] ensure that Antonio receives his educational services while incarcerated in another State [sic]."  Att. 2 to Pls.' Reply.

On July 17, 2001, while Hester was at MCTC, an IEP team from MCTC met and decided to implement Plaintiff's May 2000 IEP on an interim basis until it could reconvene.  AR at 84.  That MCTC IEP team met again on November 13, 2001, November 13, 2002, and a date in October 2003 to conduct annual reviews and update Hester's IEP. Hester was present at these meetings.

In January 2004, Plaintiff requested a due process hearing to challenge DCPS's failure to provide him with FAPE as required by the 2001 Consent Order and HOD.  On March 31, 2004, the Hearing Officer[3] issued an HOD in favor of Defendants.[4]  The Hearing Officer did not address the central issue of whether DCPS failed to comply with the 2001 Consent Order and HOD.  Instead, the Hearing Officer accepted Defendants' argument that Hester, after having been incarcerated in Maryland for over three years, was a resident of

---

[3] The same Hearing Officer, David Smith, presided over all the hearings.

[4] Plaintiff refers to a March 31, 2004 HOD in its Motion, but neither the Administrative Record nor its index includes an HOD bearing this date.  The HOD the parties cite to is dated July 19, 2004, so it appears the Hearing Officer may have reissued a prior HOD with his denial of Plaintiff's Motion for Reconsideration.

Maryland, and not the District of Columbia.  As such, the Hearing Officer determined that he was unable to order MCTC to do anything with respect to the educational services due Hester.  He further concluded that Hester had been provided educational benefit by the MCTC authorities.  Plaintiff filed a Motion to Reconsider, which was denied by the Hearing Officer's Determination issued on July 19, 2004.  Plaintiff seeks review of these decisions.

## II.  Standard of Review

Summary judgment will be granted when the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits or declarations, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c).  A fact is "material" if it might affect the outcome of the action under the governing law.  Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The nonmoving party then must "go beyond the pleadings and by [its] own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  Id. at 324 (internal quotations omitted).  See Laningham v. U.S. Navy, 813 F.2d 1236, 1242 (D.C.

5

Cir. 1987) (nonmoving party has affirmative duty "to provide evidence that would permit a reasonable jury to find" in its favor).

In deciding a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Ultimately, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Liberty Lobby, 477 U.S. at 251-52.

**III. Analysis**

Congress enacted the IDEA to ensure that children with disabilities have access to "a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." 20 U.S.C. § 1400(d)(1)(A) (2005). School districts must ensure that "all children with disabilities residing in the State . . . who are in need of special education and related services" are identified. Branham v. Gov't of the District of Columbia, 427 F.3d 7, 8 (D.C. Cir. 2005) (citing Reid v. District of Columbia, 401 F.3d 516 (D.C. Cir. 2005)). Once such children are identified, a "'team' including the child's parents and select teachers, as well as a representative of the local educational

6

agency with knowledge about the school's resources and curriculum, develops an 'individualized education program,' or 'IEP,' for the child." <u>Branham</u>, 427 F.3d at 8.  "[T]he IEP must, at a minimum, 'provid[e] personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction.'" <u>Id.</u> (citing <u>Board of Educ. Hendrick Hudson Central School Dist. v. Rowley</u>, 458 U.S. 176, 203 (1982)).

State and local educational agencies receiving federal assistance under the IDEA must institute procedural safeguards, 20 U.S.C. § 1415(a), including providing parents of a disabled child "an opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement" of their child, <u>id.</u> § 1415(b)(6).  After parents make such a complaint, they are entitled to "an impartial due process hearing" conducted by the agency, <u>id.</u> § 1415(f)(1).  "Any party aggrieved by the findings and decision made" in the due process hearing can bring a civil action in either state or federal court to obtain "appropriate" relief.  <u>Id.</u> § 1415(i)(2)(A)-(B).

"The burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief." <u>Schaffer ex rel. Schaffer v. Weast</u>, 126 S.Ct. 528, 536 (U.S. 2005).  The party challenging a hearing officer's decision in federal court, likewise carries the burden of proof.  <u>Angevine v. Smith</u>, 959 F.2d 292, 295 (D.C. Cir. 1992); <u>Kerkam v. McKenzie</u>, 862 F.2d 884, 887

(D.C. Cir. 1988).  The court may make an independent determination but "it must also give 'due weight' to the administrative proceeding and afford some deference to the expertise of the hearing officer and school officials responsible for the child's education."  Lyons v. Smith, 829 F. Supp. 414, 418 (D.D.C. 1993). In other words, a claim brought under the IDEA is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review."  Rowley, 458 U.S. at 206.  The court employs a "preponderance of the evidence" standard of review, and may grant relief as it deems appropriate.  20 U.S.C. § 1415(i)(2)(c).

### A.   Defendants Failed to Adhere to the 2001 Consent Order and HOD

Plaintiff argues that DCPS breached the agreement it entered into with Plaintiff and therefore failed to provide him FAPE, as required by the IDEA.  The agreement, entered into when all parties knew that Hester would be incarcerated at MCTC, provided that DCPS would provide compensatory education to Hester beginning November 1, 2000, until the day before Hester began receiving educational benefit by CLC.  Foreseeing that MCTC might not permit CLC to enter the facility to provide educational services to Hester, the parties agreed that the educational services could be provided in the form of compensatory education after Hester's release.[5]  Pl.'s Mot. at

---

[5] Defendants do not dispute this factual assertion.

10 and n.8.   As this agreement was fully and explicitly incorporated into the Hearing Officer's Determination of June 7, 2001, it must be construed as a consent decree or consent order with respect to those terms agreed upon by the parties. See Abraham v. District of Columbia, 338 F. Supp. 2d. 113, 120 (D.D.C. 2004) (noting that a settlement agreement incorporated into a hearing officer's determination as a final administrative decision is "analagous to a consent decree in a civil action").

The Supreme Court has explained that "[c]onsent decrees are entered into by parties to a case after careful negotiation has produced agreement on the precise terms.  The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation." United States v. Armour & Co., 402 U.S. 673, 681 (1971). Consequently, "the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it . . . the instrument must be construed as written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation."  Id. at 682; see also United States v. ITT Cont'l Banking Co., 420 U.S. 223, 236-37 (1975) (" ... since consent decrees and orders have many of the attributes of ordinary contracts, they should be construed basically as contracts, without reference to the legislation the Government originally sought to

enforce but never proved applicable through litigation."). In construing a consent decree, a court may rely on aids such as "the circumstances surrounding the formation of the consent order, any technical meaning words may have had to the parties, and any other documents expressly incorporated in the decree." Id. at 238; see also United States v. Microsoft Corp., 147 F.3d 935, 946 (D.C. Cir. 1998).

Defendants do not dispute the fact that they entered into an agreement with Plaintiff which provided that DCPS would provide Hester compensatory education from November 1, 2000 until the day before Hester began receiving educational benefit. Neither do they dispute that the incorporation of that agreement into the 2001 HOD resulted in the formation of a consent order. Instead, Defendants argue that the 2001 Consent Order and HOD should not be followed because Hester is not entitled to compensatory education and because compliance with the 2001 Consent Order and HOD was impossible. These arguments are unpersuasive.

First, Defendants argue that "[c]ompensatory education is an equitable remedy which is only to be awarded as a form of relief when FAPE has been denied." Defs.' Cross Mot. at 13. They argue that since there has been no determination that FAPE has been denied, Plaintiff's Motion should be denied. However, Defendants' voluntary entry into the 2001 Consent Order and HOD, which provided for the provision of compensatory education, clearly indicates that

it was premised on a determination that Hester met the statutory requirement of denial of FAPE.  Otherwise, Defendants could not have consented to the provision of compensatory education. Moreover, any such objection to the lack of an explicit finding about denial of FAPE was waived by agreeing to the Consent Order.

In addition, the cases Defendants cite simply do not support their assertion.[6]  See, e.g., Harris v. District of Columbia, 1992 WL 205103, at *3 (D.D.C. Aug. 6, 1992); Mrs. C. v. Wheaton, 916 F.2d 69 (2d Cir. 1990).  None of the cases involved a binding contract and/or consent order pursuant to which the school system had agreed, considering the facts and circumstances of the case, that the plaintiff was entitled to compensatory education.[7]

Second, Defendants also argue that any duty to perform under the settlement agreement should be discharged because "[i]t is well settled that when due to circumstances beyond the control of the parties the performance of the contract is rendered impossible, the party failing to perform is exonerated."  Defs.' Cross Mot. at 15 (citing Whelan v. Griffith Consumers Co., 170 A.2d 229, 230 (D.C.

---

[3] The Court notes that one of the cases cited by Defendants, Burr v. Ambach, 863 F.2d 1071 (2d Cir. 1988), was vacated by Sobol v. Burr, 492 U.S. 902 (1989).

[4] On the record before it, the Court is unable to discern exactly how it was determined that Hester was entitled to compensatory education.  That fact is irrelevant, however, as Defendants do not dispute that they entered into the agreement to provide such a remedy, or that the agreement was subsequently entered as a consent order.

1961)).   Defendants argue that since MCTC would not allow CLC
entrance into the facility, the situation was beyond their control,
and they could no longer comply with the 2001 Consent Order and
HOD.

Yet Defendants do not dispute that they entered into the
agreement knowing that Hester would be incarcerated at MCTC, and
that when the Consent Order was entered, Hester was already there.
Pl.'s Mot. at 12.   Defendants also do not dispute that in
negotiating the terms of the agreement, the parties acknowledged
that MCTC might not allow an outside provider of educational
services to enter the facility, and that if that were the case, CLC
would provide the compensatory education only <u>after</u> Hester was
released from MCTC.   Pl.'s Reply at 4.   Defendants simply fail to
respond to Plaintiff's arguments on these points, and therefore
concede their validity.   <u>See</u> Local Rule 7.1(b); <u>FDIC v. Bender</u>, 127
F.3d 58, 67-68 (D.C. Cir. 1997).

Defendants' arguments as to impossibility must be rejected for
the following reasons:  the plain language of the agreement between
the parties; the fact that at the time the agreement was entered
into Defendants were well aware Hester would be incarcerated in
Maryland for at least several years; and the failure of Defendants
to respond to Plaintiff's argument that the settlement agreement,
foreseeing the possibility that MCTC might not allow CLC into its
facility, provided that if that situation occurred Hester would

receive compensatory education after his release.  Accordingly,
Defendants must be held to the terms of the 2001 Consent Order and
HOD which they voluntarily negotiated.

   **B.    The Hearing Officer Erred in Determining that Hester Was
          Not a District of Columbia Resident**

     At the 2004 due process hearing, Plaintiffs sought enforcement
of the 2001 Consent Order and HOD and a declaration by the Hearing
Officer as to the amount of compensatory education owed to Hester.
However, the Hearing Officer focused on a different issue argued by
Defendants – whether by virtue of his incarceration in Maryland,
Hester lost his status as a District of Columbia resident.  The
Hearing Officer accepted Defendants' argument and concluded:

> Counsel for both parties submitted legal authority in
> support of their respective positions regarding
> residency, but the fact of the matter is the student is
> where he is [in Maryland], has been there for three years
> and will be there a few years more.  The Hearing Officer
> does not find the legal authority cited by the student's
> representatives convincing that this student is a
> resident of the District of Columbia . . . .

Id.  Therefore, in his view, under 20 U.S.C. § 1412(a)(1)(A)[8], the
District of Columbia was not required to provide the educational
services required under the IDEA or the 2001 Consent Order and HOD.

     The Hearing Officer's conclusion was erroneous as a matter of

_____

     [8] That section provides: "A free appropriate public education
is available to all children with disabilities residing in the
State between the ages of 3 and 21, inclusive, including children
with disabilities who have been suspended or expelled from school."

law.[9]  A person's residency does not change by virtue of being
incarcerated in another state.  <u>Lawrence v. District of Columbia
Bd. of Ethics</u>, 611 A.2d 529 (D.C. 1992) ("Many years ago, we
established that, in a general sense, a 'residence must be a fixed
and permanent abode or dwelling place for the time being and not a
mere temporary locality of existence.' . . . Inherent in the
concept are the expectation and likelihood of absences, perhaps of
some duration, from 'this fixed and permanent abode,' and the
relevance of intent and voluntariness." (internal citations and
quotations omitted)).[10]

---

[9]  The IDEA does not define the term "resident."  There seems
to be no disagreement, however, that residency determinations under
the IDEA should be made according to state law.  <u>J.S. v. Shoreline
Sch. Dist.</u>, 220 F. Supp. 2d 1175, 1191-92 (W.D. Wash. 2002); <u>Linda
W. v. Indiana Dept. of Educ.</u>, 927 F. Supp. 303, 307 (N.D. Ind.
1996), aff'd at 200 F.3d 504 (7th Cir. 1999); Defs.' Mot. at 16;
Pl.'s Opp'n at 9.

[10]  In applying this general legal principle to the election
context, the court in <u>Lawrence</u> relied on the specific statutory
definitions in D.C. Code § 1-1001.02 16(A) (defining residence for
voting within the District of Columbia as "the principal or primary
home or place of abode of a person.  Principal or primary home or
place of abode is that home or place in which the person's
habitation is fixed and to which a person, whenever he or she is
absent, has the present intention of returning after a departure or
absence therefrom, regardless of the duration of the absence."),
and D.C. Code § 1-1001.02 16(E) ("No person shall be deemed to have
gained or lost residence by reason of absence while . . . kept at
any institution at public expense, or while absent from the
District with the intent to have the District remain his or her
residence.").  While these statutory definitions are directed to
voting issues, they "provide [] a helpful and relevant gloss within
which to interpret the meaning of 'residence' under D.C. law."
<u>Lawrence</u>, 611 A.2d at 533.

Hester's presence in Maryland was involuntary, and the Defendants do not dispute that he intends to return to the District of Columbia upon his release from MCTC.   April 22, 2005 Hester Aff.. As such, Hester's residence at all times he was incarcerated at MCTC was in the District of Columbia, not Maryland.

Because the Hearing Officer erroneously concluded that Hester had lost his residence in D.C., he did not address the issue of whether Defendants complied with the 2001 Consent Order and HOD which, as noted above, provided that compensatory education was to be provided from November 1, 2000, until the day before which Hester began receiving educational benefit through CLC.

There is no evidence in the record to suggest, and Defendants do not argue, that Hester was receiving any educational services from November 1, 2000 until the MCTC IEP team's first meeting on July 17, 2001.   Although Defendants do argue that Hester did eventually receive educational benefit while at MCTC, the 2001 Consent Order and HOD specifically required that such benefit be provided by CLC, not the MCTC IEP team or Maryland's Department of Education.[11]   AR at 65.   Thus, because the explicit terms of the 2001 Consent Order and HOD were not complied with, Hester's rights

---

[11]   It is true that the parties' agreement preceding the Consent Order did not include the fact that CLC would be the provider of educational services.   That is of no moment, however. By failing to appeal the 2001 Consent Order and HOD, which did specify that CLC would be the provider of educational services, Defendants are bound by its specific terms, including those which may not have been included in the prior agreement.

to compensatory education from CLC continued to accrue during the entire time he was incarcerated at MCTC. Therefore, compensatory education must be provided by CLC for the period November 1, 2000, through August 5, 2005,[12] and the "form and quantity of compensatory education" is to be determined by Hester's District of Columbia IEP team. Id.

In determining the form and quantity of compensatory education owed to Hester, the District of Columbia IEP team should consider the educational benefit, if any, which was provided to Hester during his incarceration in Maryland. As the Hearing Officer noted[13]:

> [T]here is a significant issue here with [sic] regarding whether the student is receiving educational benefit while being in [sic] incarcerated. Based on this Hearing Officer's review of the record in particular the IEP's and meeting notes, the testimony of the student, as well as Ms. Felton, the student has made progress, but just not as much as he perhaps could have made. However, in view of the student's situation, this is understandable.

AR at 10.

Indeed, the facts regarding whether Hester received any

---

[12] Hester turned 22 years old on this date. Pl.'s Proposed Order to Motion for Summary Judgment.

[13] The Hearing Officer also observed that he was "impressed with the student and his desire to seek appropriate educational opportunities. It may be the subject of debate as to the actual benefit he is receiving, but apparently he has the desire and is progressing. In this regard, the Hearing Officer also recognizes the effort of his representatives who have continued to work with him for several years to ensure he is getting an education/training." AR at 10.

educational benefit while at MCTC, after the MCTC IEP team was
involved, are sharply disputed.  For example, at the due process
hearing in 2004, Patricia Felton, co-founder of CLC, testified that
"based on her review of documents that were provided to her by MCTC
regarding the student, the services as set forth in the DCPS IEP
dated May 10, 2000 had not been implemented and that the student
was receiving less services." AR at 5.  She further testified that
"one particular concern was the lack of career training for the
student that was a part of the DCPS IEP, but not the MCTC IEP."
Id. at 6.  Moreover, "she did not believe that the student was
receiving an individualized program, but more of a group
standardized approach."  Id.  Nobody testified on behalf of the
District of Columbia as to whether the services provided to Hester
while he was at MCTC were sufficient to comply with the 2001
Consent Order and HOD.

Felton also testified that the testing method used to monitor
Hester's academic progress, the Test of Adult Basic Education
("TABE"), is known to be inaccurate and unreliable.  AR, Due
Process Hr. Tr. at 40.  Moreover, the tests do not even establish
that Hester was benefitting from his education at MCTC.  When he
began at MCTC in 2001, he was performing at a 5.5 grade level in
math and a 6.5 grade level in language; his most recent test scores
indicate that he is performing at the 5.3 grade level in math and
a 2.9 grade level in language.  AR at 114.  Thus, his scores have

dropped significantly.

Plaintiffs further allege that between 2001 and 2003, there was a significant decline in the number of hours of special education Hester received, without any explanation for the variation.  AR at 111, 123.  The November 13, 2001 IEP indicated that Hester was entitled to ten hours of special education per week and nineteen and a half hours of regular education per week.  <u>Id.</u> at 99.  The November 13, 2002 and October 30, 2003 IEPs, however, provide for only five hours of special education per week and ten hours of regular education per week.  <u>Id.</u> at 111, 123.

Finally, Hester provided an affidavit stating that he had been in segregation for at least 90 days during the time his 2002 and 2003 IEPs were in place.  During that time, he received only two hours of special education per week (instead of five) and no general or vocational training at all.  <u>Id.</u> at 103, 118; Apr. 22, 2005 Hester Aff..  Hester further stated that he misses "about 9 or 10 class [sic] per month because my teachs [sic] don't show up."  Apr. 22, 2005 Hester Aff..

Defendants fail to explain these facts, which all tend to show that Hester has received limited educational benefit while at MCTC.  Therefore, the District of Columbia IEP team will have to carefully consider the record in this case in making its determination as to the "form and quantity" of compensatory education to which Hester is entitled.

**IV.   Conclusion**

For the reasons set forth above, Plaintiff's Motion for Summary Judgment, [**#14**], is **granted**, and Defendants' Motion for Summary Judgment, [**#16**], is **denied.**  An Order will issue with this Memorandum Opinion.

_/s/_____
May 9, 2006                          Gladys Kessler
                                     United States District Judge

**Copies To: Attorneys of Record via ECF**